Good morning, ladies and gentlemen. The first case this morning is United States v. Sanders and Ms. Hill. Thank you, Your Honor. My name is Angela Hill and I am representing Appellant Vickie Sanders in this case. Your Honors, the lower court denied due process to Ms. Sanders and violated its own local rules by failing to give Ms. Sanders the opportunity to reply to the government's response as permitted by Local Rule 7.1g. It also relied on an incorrect legal standard, as this court later ruled in United States v. Gunn. And it also abused its discretion by relying on inaccurate medical records in its 3553a analysis and by failing to fully consider Ms. Sanders' post-offense and post-sentencing mitigation arguments. Ms. Sanders is asking that this court reverse and remand for further proceedings. Under Local Rule 7.1g, Ms. Sanders had seven days from the date of the government's response to file a reply. The court, however, entered an order denying her motion for compassionate release before those seven days had expired. I beg your pardon. Is there any point that you would have made in your reply brief that you didn't raise in the motion to reconsider? If there was not, how was Ms. Sanders prejudiced? So in Ms. Sanders' reply, I believe what Ms. Sanders would have raised in her reply is she would have responded to the new evidence and to new arguments that were raised by the government. So the response, the government included new evidence that were new medical records that included the fact that Ms. Sanders had contracted COVID since she filed her motion for compassionate release. It also included information suggesting that she was asymptomatic whenever she got COVID. The government's response also made the suggestion that Ms. Sanders would be immune. So and the court did latch onto that and to those records in denying her motion for compassionate release. So in reply, Ms. Sanders would have addressed that evidence in that the government had attached to its response. It would also have elaborated on the suggestion that she would have been immune and of course cited to the evidence out there surrounding immunity to COVID. It also would have, you know, attacked the idea that she was asymptomatic, which the court did rely on in its order denying her motion. So those are some of the factors that she would have addressed in a reply brief. She, for instance, I believe Ms. Sanders would have included her own declarations, including that she was not asymptomatic and maybe other evidence that she could have, if she could have included any other evidence that would have shown that she was not asymptomatic. So that would have been evidence that she would have included. So this court has held in Robert L. Minders versus the United Healthcare that local rules must give way whenever they infringe upon due process and fundamental fairness. And here, the denial of her ability to respond to this new evidence and new arguments by the government was a denial of due process and fundamental fairness. And whenever the district court interpreted the local rules in a way that denied her the opportunity to file her reply brief, that did deny her due process and the right to file that response was in violation of her rights to due process. And as I did indicate, the court did specifically rely on this new evidence and this new argument. On page seven of the court's order, the court indicates that in its analysis that Ms. Sanders has tested positive for the virus and she's not displayed any symptoms. And it's important to note that the sum of the court's 3553A analysis was only about two pages. And in those two pages, that's part of its analysis that it finds important to include in those two pages. It also, because it felt it was bound by 1B1.3, it included the dangerous analysis where it felt it had to deny the motion but found Ms. Sanders was a danger. And as part of that, it said Ms. Sanders' medical conditions did not inhibit her criminal activity or drug abuse. And of course, the new medical records and her reaction or her symptoms from COVID would have been relevant to her medical condition and whether she would have been a danger under the court's reasoning. What were those COVID symptoms? The COVID symptoms from my discussions from Ms. Sanders, of course, those weren't allowed to be in the record, of course. But Ms. Sanders did indeed have symptoms. She had problems breathing. Of course, Ms. Sanders has serious medical conditions, including COPD and asthma. And one can imagine that COVID is serious for her. But she did, in my conversations for her, had difficulty breathing. It was very scary for her. And at the time she is in Florida, where COVID is very overwhelming at the time. And at the time, it was the understanding of many inmates at the institution that there may not be hospital beds available were they to become seriously ill. So it was a very big concern for her at the time. Fortunately, she didn't make it through. But at the time, she had problem breathing and it was evident on phone calls that she was having severe difficulties. This was all based on a phone call, right? These are the phone calls that I had from her, which is the only ability that we really have to interact with Ms. Sanders. She's incarcerated in Florida. And the only, we would get letters from Ms. Sanders talking about her symptoms. Those would be the only way we have to interact with her. The government, in its response, suggested that Ms. Sanders somehow waived her right to due process because she requested expediting briefing. But of course, the court in its motion, or Ms. Sanders did file a motion for expedited briefing. However, the court never set a date for Ms. Sanders to file a reply. So there was no expedited briefing date for the reply to be filed. It only set a briefing date for the response to be filed. The local rule requirement, of course, is seven days for Ms. Sanders to file her reply. The government also suggested that Ms. Sanders should have notified the court of its intent to file a reply. But there is no such requirement in the local rules that Ms. Sanders notify the court of any intent to file a reply. The local rules just give Ms. Sanders the opportunity to file a reply within seven days. And also, the Supreme Court has held in Hollingsworth versus Perry that courts are bound by their local rules. The local rules have the force of law. Clearly here, the local rule permitted Ms. Sanders to file a reply within seven days. And the court denied her that right to file her reply within seven days when it denied her motion for compassionate release before those seven days had expired. Next, in the court, before this court decided United States versus Gunn, the court denied Ms. Sanders' motion for compassionate release. It did fill, the court felt that it was bound by 1B1.3. I think the only practical impact on this case is that the court felt that it was bound by the directive that it had to deny Ms. Sanders' motion if it found that she was a danger to the community. So the court specifically says this in its order that it was bound by the policy or statement that it had to deny her motion if she was a danger to the community. The dangerousness was relevant to the 3553A analysis, but under the court's ruling in Gunn, this should not have been a standalone consideration. In other words, it should not have been a factor that alone should have been determinative of whether Ms. Sanders' motion should have been denied. It should have been balanced along with the other 3553A factors. But the court clearly believed that it had to deny her motion. The court also abused its discretion whenever it considered Ms. Sanders' medical conditions. It relied on inaccurate information. It's clear here that the court did not consider the up-to-date medical information. The court gives its account of what it believes is Ms. Sanders' medical history on page two of the order. And in that medical history summary, it cites to the medical history that's included in the PSR, and it cites to the new evidence, the 21 pages that was included by the government in its response. It does not include the evidence that Ms. Sanders included that included some important medical conditions, including that she had COPD, including that she had asthma. And these medical conditions were relevant to her arguments that if she contracted either Legionella or COVID, which were both outbreaks at the facility she was detained at, that she would suffer serious illness, including death. And these were relevant to the court's analysis in several respects. It's clear that this was absent from what it took into account of her medical conditions. The court specifically concluded that Sanders' medical conditions did not inhibit her criminal activity or her drug abuse. But of course, it's not clear that it ever considered a full picture of what her medical conditions consisted of. Finally, it's clear here that the court failed to consider Ms. Sanders' mitigation arguments, including her medical. Precisely what medical conditions were unknown to the judge? The medical conditions that were included in the medical records that weren't in the PSR and that weren't in the new records were COPD, asthma, and obesity. Those were the ones that were relevant to her arguments. Now, it is important to note the judge does cite to what her arguments are in the beginning of its order. But it makes a citation. But it doesn't include that in its summary of what it says her medical history is. It simply cites her argument. And then whenever the court goes into her medical history, it has a specific section entitled medical history. And it sets out what the court believes her medical history is. All it does there is cite to what the PSR says her medical history is. Then it goes on to cite to what the government says or what the government's records say about the new information that she contracted COVID. It doesn't include the medical information that she suffers from COPD, that she suffers from asthma, and that's excluded in her of the court's order. And those are both very important to the analysis as it relates to Legionella and as it relates to COVID. As both the CDC indicates that those conditions are relevant if one were to contract either Legionella or to CDC or Legionella or COVID. And those citations are included in Ms. Sanders' briefing on the issue in the district court. And the district court also abused its discretion by not considering the extensive evidence of her post-offense and post-sentencing mitigation arguments. She included extensive evidence that she had a perfect disciplinary record while she was in the and mental health treatment. She had a good work record in the Bureau of Prisons. She had actually participated in a distance learning program. One of her goals, and actually she had told this to the judge at sentencing, and she cited to this in her briefing that in the transcript at sentencing, she told the judge that what she wanted to do was become a substance abuse counselor and help people that had the same substance abuse problems that she did. And she made good on that promise. She took distance learning classes and got a certificate to become a substance abuse counselor while she was in the Bureau of Prisons. She attached evidence of that. She completed her GED and was a valedictorian of her GED class in the Bureau of Prisons. But in the order denying the motion, the court does not make mention of that or include that in the 3553A analysis. Rather, it focused on the offense conduct. And there's also indication in the order denying the motion that it's not clear that the court really, truly recognized that it could consider that in its analysis. It made very light of that. And I see that I'm running out of time, Your Honor. All right. Thank you very much. Mr. Budwitz. Good morning, Your Honors. May it please the court and counsel. My name is Casey Budwitz, and I represent the Appalachian United States in this matter. I want to first start by addressing Judge Roedner's question to the appellant about any new information that she could have alleged but didn't in her motion to reconsider concerning her due process argument. And unlike the appellant, the government does believe that the posture in which the appellant framed her motion is important. It was characterized as an emergency motion. She did make a request to expedite briefing in the matter, did request the court to rule on this matter in an expedited basis. And when the court did so, the appellant cited a complaint that she did not have an opportunity to reply. But the appellant did file a motion to reconsider, and in that motion to reconsider addressed what she believed the contentions of error would have been. For any issue that she didn't raise, she waived it and did not give the court the opportunity to rule upon it, including this new information before this court for the first time that Ms. Sanders did suffer some complications or side effects of any potential COVID exposure. But more to the point, and what's important to understand is I think the appellant is misreading the district court's orders and what the district court relied on and what the district court did not rely on prior to the district court making clear the substance of its orders. As we do that, Mr. Bloodworth, would you be kind enough to address Ms. Hill's point about danger to the community and Judge Gilbert feeling bound under the guideline to deny the motion on that basis, please? Yes, Your Honor. And this briefing came about during the gun decision, and the government spent some time in its brief advancing a litigating position that has somewhat been decided now. But Judge Gilbert did in his order indicate that he felt that he was bound by 1B1.13. But I think what's important to note is it was a specific part of 1B1.13, and that was the dangerousness analysis. And Judge Gilbert in his order characterized that in conjunction with 3553A. I'll direct the court's attention, and the government will certainly submit a 28-J letter following this hearing to United States v. Saunders, which was just published Monday, February the 8th, by a different panel of this court, where it discussed this very issue and the very issue in Saunders. That's case number 20-2486. That court also felt bound by 1B1.13's requirement that the district court also analyze 3142. But the Saunders court found it was harmless error, and essentially why it would be harmless error is 3142's factors to be considered are intimately bound up with 3553A. And it's clear in the district court's order on document 119, it felt that it was bound by that particular policy statement, but it also analyzed it in conjunction with 3553A. So in light of Gunn, I'm not sure that the district court's order is a statement of constraint rather than an exercise of discretion, because it certainly could view 1B1.13 as a model or factors to consider. And it would necessarily have to consider the dangerousness analysis under 3142 when it applied the 3553A factors. Well, I mean, the government never did file a petition for a hearing in Gunn. That's right, Your Honor. Yeah. So there's no doubt that it's the law of section 1B1.13 in exercising its discretion. What is the Department of Justice's decision as to whether and when a prisoner's underlying health conditions might render the prisoner eligible for relief in view of the COVID-19 epidemic? Your Honor, you're certainly correct that there was no petition for rehearing in Gunn, and the government concedes now that that is the law of the circuit. And the briefing was done in the middle of Gunn. Yeah. So we had to advance that position. But we certainly concede that Gunn is the law of the circuit. In this particular case, Your Honor, I think it's important to note that the district court conceded that Ms. Sanders' medical conditions would amount to extraordinary, compelling circumstances. The district court says so a number of times, and to erase any doubt in that, in the order on the motion to reconsider, document 121, the court clearly said in its concluding paragraph that on page 5, after considering the applicable factors in 3553A, the court determined here that extraordinary and compelling reasons did not warrant a modification. So in this case, the district court did concede that Ms. Sanders' medical conditions did amount to extraordinary and compelling circumstances, but as the district court should do, continued on to a 3553A analysis. So any other reliance on 1B1.13 I think is harmless in the sense that it didn't affect the district court's decision in this case, which essentially brings to what the government believes is the overriding point in this appeal is did the district court use its discretion in applying 3553A? And I think the answer is clearly no. And again, in U.S. v. Saunders, this court spelled out that that's a broad discretion. And in this case, the district court again conceded. You can look at document number 119 on page 7 that Ms. Sanders' conditions would amount to extraordinary and in theory place her at higher risk from severe illness from COVID-19. Document 121, page 2, the court clearly said that the court balanced Sanders' severe medical conditions with her decades-long history of crime. So the district court on a number of occasions recognized the fact that Ms. Sanders' medical conditions were serious and amounted to a number of things and used the language of 3553A in denying the motion, such as Ms. Sanders' criminal history, when the court said on page one of document 119 that she received several drug-related convictions in California in the 80s and 90s, as well as a 97 conviction for forgery. On that same page, the district court recognized that Ms. Sanders, with others, manufactured methamphetamine over the course of a year, that Ms. Sanders then on that same page began manufacturing methamphetamine on her own, attributed over 700 grams of methamphetamine to herself. But more importantly, the district court addressed the recency of the conviction in criminal conduct in discussing the active methamphetamine lab that was in her home and a loaded handgun that was in her home when law enforcement responded to her residence. It was a situation that in implying the 3553A factors that the district court felt, and I quote from page six, that it was a recent and deplorable offense and it placed the welfare of the community at risk. The district court's orders are littered with examples of its exercise of its discretion and why it was exercising its discretion in the manner in which it did in applying the 3553A factors. The fact that if there was going to be any compassionate release, it was going to be to release her to her home. And that's where she was doing the manufacturing, so to speak. Isn't that correct? That is correct, your honor. And one of the specific remedies that Ms. Sanders requested in her motion was to be released on home confinement. And the district court analyzed that as it should under 3553A on appropriateness of other sentences. And the district court found that that was an applicable standard and said that that was unworkable essentially because Ms. Sanders' criminal conduct occurred in her home. And the found that that plan was unworkable, which is a further illustration of the exercise of the district court's discretion in this matter. So I think to go back to Judge Roedner's question on 1B1.13, I think it's important to note that the appellant also conceded that that reliance, although now incorrect under gun, does not amount to much in this case because in her reply brief on 1B1.14, the appellant says Ms. Sanders agrees that the district court primarily rested on a weighing of the 3553A factors. And your honors, that's what the appeal in this matter down is whether the district court in analyzing the 3553A factors after conceding that Ms. Sanders' medical conditions amounted to extraordinary compelling circumstances, whether compassionate at least was appropriate. And the district court found that it wasn't. And the government believes that that was appropriate, was an appropriate exercise of the significant discretion entitled to the district court. So unless there are any questions, the government will rest on its brief for the remaining issues in the appeal. It's probably outside the record, but can you tell me whether there are any ongoing problems with either COVID-19 or Legionnaire's disease at FCI Coleman? Your honor, I cannot answer that question. I didn't look at the statistics prior to the hearing because they were not part of the record. So I apologize. I cannot answer that question. Thank you. Thank you, Mr. Budworth. And Ms. Hill, you've exhausted your time as well. So thanks to both counsel and it can be taken under advisement.